**WILLEMS INDUSTRIES, INC.**
v.
**UNITED STATES.**
No. 397–56.

United States Court of Claims.
Nov. 1, 1961.
Rehearing Denied Jan. 12, 1962.

During September 1950, Jess Larson, Administrator of the General Services Administration (GSA) created the Emergency Procurement Service (EPS) within GSA and delegated to it authority he had received from the Munitions Board to purchase, store, and dispose of critical and strategic materials for the national stockpile pursuant to the Strategic and Critical Materials Stockpiling Act of 1946, 60 Stat. 596, and the Defense Production Act of 1950, 64 Stat. 398.

After ascertaining that columbite ore was in short supply and being purchased for the national stockpile, Edward J. Willems, President of the plaintiff corporation, in a letter dated March 13, 1951, offered to sell to EPS approximately two million pounds of the ore from sources in British Guiana on terms specified therein. On March 29, 1951, a revised offer was submitted in which plaintiff stated that it was unable to furnish a fixed delivery schedule, but that shipments would start within six months after the contract was awarded and that as development of the supplies progressed, plaintiff would furnish to EPS quarterly delivery schedules working under a five-year program to deliver a total of about two million pounds of the ore. In addition to such matters as price, specifications regarding the quality of the ore, etc., and a statement to the effect that the primitive conditions at the source of the ore would require considerable effort and expense for development, the revised offer contained the following paragraph:

Richard J. Stull, New York City, for plaintiff. Stull & Stull, New York City, were on the briefs.

John F. Wolf, Washington, D. C., with whom was William H. Orrick, Jr., Asst. Atty. Gen., for defendant.

DURFEE, Judge.

In this action, plaintiff seeks damages in the amount of $1,800,000 for losses alleged to have been sustained in consequence of breach of contract by defendant and defendant counterclaims for $976,000 damages alleged to have resulted from a breach of contract by the plaintiff.

"Having the assurance and with the help of the United States Government, we are prepared to speed up, and step up, production as rapidly as conditions will permit, by installing whatever feasible equipment may be deemed necessary to achieve the most satisfactory end results."

By telegram dated April 13, 1951, H. C. Maull, Jr., of EPS, responded in language purporting to accept the offer (finding 7). The acceptance differed from the offer in several material respects, and

was entirely silent regarding the matter of Government assistance.

On August 1, 1951, Willems wrote to Captain Maull of EPS informing him that the EPS acceptance deviated from the offer in several respects, and in particular, as follows:

"(d) Our offer states clearly quote *'Having the assurance and with the help of the United States Government.'* Your instrument neither gives assurance nor offers help."

On August 3, 1951, Willems and a Mr. Wolfson, secretary of plaintiff corporation, conferred with EPS officials in Washington. After plaintiff's representatives had complained of the divergencies between offer and acceptance, the parties entered into a detailed written contract, defining the full scope of their respective obligations and rights in connection with the transaction. The contract stated that the Government procurement was undertaken pursuant to the Strategic and Critical Materials Stockpiling Act of 1946. Prior to the signing of the contract, plaintiff's representatives informed the EPS officials that plaintiff was a small company and would require financial aid from the Government to discharge its contractual obligations. The evidence also indicates that Captain Maull informed Messrs. Willems and Wolfson that EPS had no authority under the Strategic and Critical Materials Stockpiling Act of 1946 to make loans to assist EPS contractors, but that certain other government agencies were empowered to do so.

On August 23, 1951, EPS, acting pursuant to a term of the contract, established a letter of credit in the amount of $100,000 with a New York bank, which provided for sight drafts to be drawn by plaintiff as partial payment on the invoiced amounts of shipments of ore meeting specified standards.

From July 1951 on, plaintiff was in communication with the Economic Cooperation Administration (ECA) regarding a loan application for aid in securing equipment necessary for the development of the area in which the columbite ore was to be mined. Despite communications with several ECA officials, as of September 11, 1951 no loan commitment had been made, although ECA was investigating the project and considering the application. Prior to this time plaintiff had also applied for a loan at the Export-Import Bank.

During that period, by Executive Order No. 10281, 16 F.R. 8789, dated August 28, 1951, the President established the Defense Materials Procurement Agency (DMPA). Executive Order No. 10281 (Finding 21) delegated to DMPA authority to purchase strategic minerals and materials and encourage their development, pursuant to the Defense Production Act of 1950. While EPS was thus relieved of its procurement responsibilities under the Defense Production Act, it retained those deriving from the Strategic and Critical Materials Stockpiling Act of 1946. Jess Larson was named Administrator of DMPA, and certain personnel from other agencies were transferred to DMPA. Among the latter was a Mr. McClintock, who became a regional specialist in the Foreign Expansion Division of DMPA, and who, while at ECA, had communicated with Willems regarding the loan.

After learning of the transfer of McClintock and certain ECA functions to DMPA, on December 11, 1951, Willems mailed an application for a loan of $153,720.00 for exploration of 12,000 acres of land in British Guiana, to DMPA, for the attention of McClintock. On December 12, 1951, Charles E. Stott, Director of the Foreign Expansion Division, DMPA, replied to Willems' letter advising him, *inter alia,* that the quality of engineering supervision and management to be employed on the project would exert strong influence upon DMPA's consideration of the loan application and requesting further information in that context.

Later in December Willems met with Philip McKenna, President of Kennametal, Inc., a firm with considerable mining and metals experience which had

utilized columbite in its manufacturing operations, and which was interested in acquiring columbite bearing properties. At the meeting discussion concerned the possibility of Kennametal joining with the plaintiff in the columbite venture in British Guiana.

On January 14 and 15, 1952, meetings ensued between representatives of Kennametal and the plaintiff and McClintock and Stott of DMPA concerning the loan application. Terms were discussed, and on January 15, 1952, McClintock suggested that Kennametal and plaintiff submit a new and complete application. McClintock advised the applicants that prior to any action on a contract, it would be necessary to obtain the approval of his division director, and to submit it to the Deputy Administrator, and finally to Jess Larson, the Administrator, for his signature and approval. That afternoon plaintiff and Kennametal drafted a memorandum agreement providing that Kennametal would advance certain monies to plaintiff and join in the venture to develop the columbite sources in British Guiana.

The completed loan application was submitted to McClintock on January 16, 1952. As set out in the application, the loan was to be in the form of an advance against production. In a letter dated January 23, 1952, McClintock advised plaintiff that the application had "been approved in principle" and that arrangements had been made for a conference to work out the details of a contract.

On February 15, 1952, in response to a letter from a Kennametal official, McClintock noted that preparation of legal documents was not the sole impediment to the granting of the loan. As an additional impediment he specified the EPS contract, specifically the delivery schedule —deliveries to begin within six months after execution of the August 3, 1951 contract, 400,000 pounds of ore to be delivered by June 30, 1953—and pricing terms to which plaintiff had thereby obligated itself. He also noted that although preparation of a draft contract upon which finalization of the agreement in

principle could be effected was proceeding, execution of a contract was a condition precedent to the earmarking of government funds for the project. There is evidence indicating that during previous meetings, DMPA officials had objected to the EPS contract and even demanded its cancellation by plaintiff as a condition precedent to the granting of a loan, on the grounds that plaintiff would be unable to meet the obligations undertaken by it in that contract as to price and delivery, and that DMPA wished to procure the columbite ore itself. There is also evidence indicating that Kennametal officials felt that plaintiff's position under the EPS contract was disadvantageous. Nevertheless Willems refused to cancel the EPS contract unless the Government replaced it with one at least as advantageous.

Another conference occurred in the DMPA offices on March 7, 1952. McClintock presented a copy of a rough draft of a proposed loan agreement to representatives of plaintiff and Kennametal, who raised numerous objections to the terms. McClintock informed them that a new DMPA regulation to be released shortly provided a substantially higher schedule of prices than those specified in the EPS contract for ore of similar qualities. That afternoon Willems and the Kennametal representative conferred with Mr. Regan, a DMPA attorney, to analyze the proposed contract. They suggested numerous amendments and deletions to Regan, who informed them that he lacked authority to agree to the suggested changes and that the requested deletions and amendments might have to be restored when the contract was executed.

On April 2, 1952, McClintock informed Kennametal that Willems was unacceptable to DMPA as head of the project.

A final conference ensued between the parties on April 15, 1952. At that time sharp disagreement arose between Willems and the DMPA officials, regarding among other matters, the cancellation of plaintiff's EPS contract and Willems' management of the project. The

results of the conference were inconclusive.

On April 17, 1952, Kennametal withdrew from negotiations with plaintiff. Upon learning of this, DMPA officials treated the negotiations regarding the loan as terminated. They were never resumed. Thereafter plaintiff was apparently unable to pursue the project to maturity due to lack of capital.

By letters dated January 10 and April 7, 1952, the contracting officer of EPS requested that plaintiff supply statements showing the quantities of ore to be delivered during the first quarter of 1952, as required by the EPS contract.

On April 17, 1952, plaintiff replied by mail requesting extension of the original letter of credit to the end of 1952. On May 21, 1952, plaintiff wrote to EPS, stating that it aspired to attain weekly production of approximately 1,000 pounds of ore by August or September of 1952, and also that it hoped to obtain a Government loan for the purchase of equipment necessary to fulfill the EPS contract.

On May 28, 1952, plaintiff, in a letter, informed EPS that it contemplated shipping 25,000 to 30,000 pounds of ore by the end of 1952, but that this was largely contingent upon plaintiff's ability to obtain the equipment necessary to accelerate production. Plaintiff again requested extension of the letter of credit. On the following day plaintiff, by mail, requested amendment of the contract to extend the original shipment date to the end of 1952.

On June 11, 1952, the contracting officer of EPS replied to plaintiff's correspondence, requesting clarification of the discrepancies apparent in the previous communications regarding the amounts and dates of shipments specified, and the request for extension of the date for the original shipment beyond the end of 1952. The contracting officer also requested that plaintiff advise him concerning the necessity for extending the letter of credit through the latter half of 1952, when plaintiff contemplated no deliveries during that period.

On February 5, 1953, EPS advised plaintiff by registered letter that unless deliveries commenced prior to February 15, 1953, plaintiff's right to proceed under the contract would be terminated. On February 17, 1953, EPS notified plaintiff that inasmuch as no deliveries had been tendered under the contract, EPS was terminating plaintiff's right to proceed, pursuant to special article 15 (finding 57), without prejudice to any rights the Government might have in consequence of plaintiff's breach of contract.

■ Plaintiff initially contends that a commitment to advance government loans must be inferred from its negotiations and contract with EPS, and that DMPA, which plaintiff asserts is for these purposes identical with EPS as an organ of GSA, in making the granting of a loan contingent upon cancellation of the EPS contract, effected an anticipatory breach of the EPS contract, excusing plaintiff's performance, and entitling plaintiff to damages.

■ In asking us to infer from the EPS contract that defendant obligated itself to obtain a government loan for plaintiff, plaintiff stresses the statement in its revised offer of March 29, 1951 to the effect that "having the assurance and with the help of the United States" plaintiff would be able to accelerate production and deliveries. The most elementary principle of contract law requires that an offer, to form the basis of a binding agreement, must be sufficiently definite to enable a court to construe it with precision for purpose of enforcement. 1 Williston, Contracts § 37 (3d ed. 1957). Not only is the statement upon which plaintiff relies indefinite as to the amount of the loan allegedly sought, it is entirely ambiguous as to the type of assistance desired, financial or otherwise. Indeed there is provision in the August 3, 1951 contract, specifying that the Government would assist plaintiff by expediting delivery of machinery for which plaintiff had placed firm purchase orders. Furthermore, defendant's telegraphic acceptance of the March 29, 1951 offer stated nothing whatever regarding financial aid,

indicating at least that defendant expressed no intention to contract to secure financial assistance for plaintiff. Moreover, Willems' letter of August 1, 1951 to the EPS officials indicated that plaintiff was aware of defendant's failure to assume any obligation regarding a loan. In view of these circumstances, we must conclude that the evidence in the record concerning the period prior to the contract of August 3, 1951 does not support an inference to the effect that defendant had legally obligated itself regarding the financial assistance that plaintiff required to perform its contractual obligations.

■ The August 3, 1951 contract between EPS and plaintiff is a lengthy, integrated document dealing in detail with every aspect of the mutual obligations of the contracting parties. Consequently, it must be deemed conclusive as to the contractual arrangement extant between the parties, in derogation of any prior commitments the substance of which it embodies. Holmberg v. United States, 91 Ct.Cl. 501.

Moreover, the evidence indicates that on August 3, 1951, the date the contract was signed, EPS officials informed plaintiff that they were acting pursuant to the Strategic and Critical Materials Stockpiling Act of 1946, which conferred no authority to extend financial assistance. Since neither the offer and acceptance nor the August 3, 1951 contract obligated EPS to secure financial assistance for plaintiff, and since plaintiff was duly apprised of the lack of intention of the EPS officials to incur any such obligation, we must conclude that the procurement of a loan for plaintiff had never been a part of the obligations undertaken by EPS in its contractual arrangement with plaintiff. Consequently, failure by EPS to secure a loan for plaintiff could under no circumstances be deemed a breach of contract.

Plaintiff further asserts that DMPA's refusal to extend a loan to plaintiff unless the EPS contract were canceled, effected an anticipatory breach of the EPS contract in two respects: first, DMPA failed to discharge the Government's obligation under the EPS contract regarding plaintiff's loan; and second, on the theory that a party to a contract is obligated to facilitate, if possible, performance by the other contracting party rather than impede it. Since we have already decided that EPS had never contracted to furnish plaintiff financial assistance, only the second theory requires further consideration.

Plaintiff's argument to the effect that DMPA breached the EPS contract by demanding its cancellation as a condition precedent to the granting of a loan, is necessarily bottomed on the concept that EPS and DMPA, as organs of GSA, were for the purposes of the contract and this proceeding identical. Only on this assumption can plaintiff construct an argument to the effect that DMPA's actions constituted impediment of performance under the contract by a contracting party.

The EPS contract states on its face that EPS was acting in a procurement capacity under authority of the Strategic and Critical Materials Stockpiling Act of 1946. DMPA was endowed with procurement authority deriving from the Defense Production Act of 1950 in addition to its delegated lending authority pursuant to Executive Order No. 10281. DMPA was empowered generally to lend money to encourage development of sources of strategic materials pursuant to the Defense Production Act. The exercise of DMPA's delegated authority was entirely independent of EPS action and control, originating as it did in separate, independent legislation. Implicit in the delegation to DMPA of authority to make loans from a fund of money is the discretion to select as projects for investment those promising the most fruitful use of the available funds while insuring greatest protection of the capital invested. Consequently, it would seem perfectly reasonable for DMPA officials to refuse to lend money for plaintiff's venture if they believed that the obligations which plaintiff had undertaken in the EPS contract were sufficiently disadvantageous to make fruition of the development project doubtful, thus jeopardizing the integrity of

the funds loaned. In this context, we think it significant that plaintiff sought terms whereby repayment of the proposed loan would be required exclusively in the form of deliveries of ore, and that plaintiff and its co-venturer refused terms whereby they would have been bound to repay the loan in the event that exploration proved commercial development of the sources unfeasible and no deliveries were made. On the other hand, DMPA might well have demanded cancellation of the EPS contract as a condition precedent to the granting of the loan to the end that it might contract with plaintiff to purchase the ore pursuant to its own procurement program, thereby placing control over the loan and procurement under the aegis of the same agency. The factor of prime importance is that EPS and DMPA were in fact separate entities, albeit both were within GSA, acting pursuant to different legislation towards objectives that were not necessarily either identical or reciprocal. EPS, under the Strategic and Critical Materials Stockpiling Act of 1946, was functioning solely in a procurement capacity when it contracted with plaintiff, and thus presumably would best serve the legislative purpose by purchasing the ore at the lowest price attainable under market conditions. DMPA, on the other hand, was concerned, pursuant to its statutory authority, with a broader program of encouraging development of strategic materials in short supply, as well as with procurement. As a lender, DMPA was genuinely interested in the security of funds invested in plaintiff's project and consequently directly concerned with the possibility of the project failing due to the inability of plaintiff to perform under a disadvantageous contract with EPS. Moreover, DMPA, by virtue of its authority to encourage development of strategic materials in short supply might ultimately have paid higher prices for the ore than those specified in the EPS contract. On the basis of the record and the circumstances noted above, we conclude that the two agencies were not identical for the purposes of the transaction, and that DMPA's actions did not constitute the actions of a party to the EPS contract. Consequently, we find that the DMPA demand for cancellation of the EPS contract as a condition precedent to the granting of the loan did not precipitate an anticipatory breach of the EPS contract by the Government. As noted earlier, DMPA was under no compulsion to advance the loan, and plaintiff was in no way proscribed from seeking the funds it required elsewhere.

█ Regarding the EPS contract, plaintiff alleges additionally that EPS committed a breach by failure to renew the letter of credit for the benefit of the plaintiff. We see no merit in this contention since the contract obligated EPS to maintain the letter of credit only as a medium for partial payment to plaintiff for shipments of ore actually made pursuant to the contract. Maintenance of the letter of credit was not a condition precedent to plaintiff's performance. Inasmuch as plaintiff never developed the lands on which it held mineral concessions sufficient to achieve commercial production and thus never approached the position where it could deliver quantities as specified in the contract, failure of EPS to renew the letter of credit had no effect whatever on plaintiff's ability to discharge its contractual obligations. On the contrary, the evidence supports the finding that at all times until February 15, 1953 EPS was ready and willing to discharge its obligations, but that plaintiff was patently unable to perform under the contract. Cancellation by EPS was entirely justified under the clause of the contract that accorded EPS the absolute right to terminate, notwithstanding any other term embodied therein, if by February 15, 1953 plaintiff had made no deliveries. While it is true that plaintiff supplied some samples of the ore for the Government's analysis, the record discloses no shipments by plaintiff that in quantity or under any other criteria might, even under the most generous con-

struction, be deemed deliveries pursuant to the contract.

Plaintiff attempts to rely on the *force majeure* clause of the contract, which would extend the dates for performance in the event of delays due to the occurrence of certain contingencies beyond plaintiff's control. Plaintiff cites as the contingency invoking the *force majeure* clause the failure of DMPA to lend plaintiff the funds it required to perform its part of the contract. The cause of plaintiff's inability to perform, rather than deriving from a contingency beyond plaintiff's control, lay solely in the conspicuous undercapitalization of the corporation with relation to the obligations it undertook under the EPS contract. As noted above, neither EPS nor DMPA was at any time obligated to advance funds to plaintiff, and plaintiff was not restricted to these agencies, or to the government, in its quest for the funds it required. Plainly, plaintiff's undercapitalization is not such a circumstance beyond its control as to be within the purview of any *force majeure* clause.

Plaintiff asserts further that it suffered damages in consequence of a breach of contract to make a loan on the part of DMPA. It is plaintiff's position that by McClintock's letter of January 23, 1952, DMPA contracted to issue the loan. The letter reads as follows:

"Referring to your application in conjunction with Kennametal, Inc., for an advance against production pursuant to recommended development program in British Guiana has been approved in principle.

"Arrangements have been made for a conference next Monday to work out the details of a contract."

Plaintiff contends that the words "approved in principle" in the letter effected an acceptance in fact of the loan application, thereby establishing a contract under which DMPA obligated itself to advance funds to plaintiff.

We must ascertain whether McClintock's letter was sufficiently positive and unequivocal, so as to indicate intention to assent to the offer, and to create a contract. 1 Williston, Contracts § 72 (3d ed. 1957). We think it was not. While the words "approved in principle" bear the connotation of a vague sort of assent to the general idea of a plan or project, we believe they do not indicate unequivocal acceptance of a specific offer with intent to effect a contractual relation, even as the use of the word "approved" exclusively might be susceptible of such construction. The second sentence of the letter, proposing a date for a conference at which the details of the "contract" might be worked out, complements and confirms this construction. The expressed need to "work out the details of a contract" connotes clearly the fact that negotiations had not yet been concluded, and that the letter itself could not be construed as creating the contract. That McClintock did not intend the phrase "approved in principle" to create a contract is borne out by the facts attending the negotiations. DMPA procedure required that the regional specialist (McClintock) would review a proposed project with the loan applicants. If he deemed it meritorious and within a DMPA program, he would reach a tentative agreement with the applicants regarding the extent of the project and the manner of effectuation. This was termed as a phrase of art, an "agreement in principle." The regional specialist would then prepare a summary of the project for the Director of the Foreign Expansion Division, with a recommendation that negotiations toward a possible contract be continued. If approved by the Division Director, the specialist and the DMPA legal staff would attempt to work out the detailed contract with the applicant. When the parties agreed on the terms of a proposed contract, a draft thereof would be submitted to the Division Director for his approval, after which it would be sent to the Administrator for his signature (finding 32).

Although plaintiff might not have been fully apprised of this procedure, on Jan-

uary 15, 1952, only eight days prior to the date on his letter, McClintock informed the applicants that prior to the granting of any loan, a contract would have to be prepared which would meet the approval of the Division Director and be signed by the Administrator. Since plaintiff was to this extent aware of the procedure, and in view of McClintock's allusion to the projected conference to "work out the details of a contract," we conclude that plaintiff had no reasonable basis for construing McClintock's letter of January 23d as an acceptance of its loan application establishing a binding contract between the parties.

■ Having concluded that defendant was not guilty of any breach of contract, let us now consider defendant's counterclaim for damages based on plaintiff's nonperformance under the EPS contract. The single reason for plaintiff's failure to perform its obligations under that contract was its obvious undercapitalization. As noted earlier, plaintiff was aware of its lack of sufficient funds to perform when it committed itself under the EPS contract but proceeded regardless, on the assumption that it would be able to raise the capital, probably from the government. When the needed funds failed to materialize, due to no legal malfeasance by the Government, plaintiff could not develop its properties and thus could not make any deliveries under the contract. Plaintiff's failure to perform, on the basis of the record, undoubtedly constituted a breach of contract. The Government was within its rights in terminating plaintiff's right to perform by invoking the article of the contract providing precisely for such action in the event of plaintiff's failure to make any deliveries prior to February 15, 1953, and which preserved whatever other rights might accrue to the Government in consequence of plaintiff's failure under the contract. Under the basic principles of contract law, plaintiff is liable to defendant for damages in an amount equal to the losses incurred as the natural and proximate consequence of plaintiff's breach of contract.

In the present case defendant concedes that EPS did not replace the ore undelivered under the EPS contract, but argues that the Government suffered damages directly attributable to plaintiff's breach in the amount of $976,000. While EPS did not replace the undelivered 2,-400,000 pounds of ore, on May 28, 1952 DMPA was authorized by an administrative order to procure fifteen million pounds of columbite ore by the end of 1956, at prices designated therein (finding 58) pursuant to which the Government calculates it would have had to pay $976,000 more for 2,400,000 pounds of ore of the quality to be delivered under the EPS contract than it would have paid had plaintiff discharged its obligations (finding 62). In view of the relatively short supply of columbite at the time, defendant argues vigorously that by virtue of the fact that the Government held itself out as ready to purchase fifteen million pounds of the ore at the higher prices, those prices became the market prices, and thus, since in the case of a breached sales contract the measure of damages is usually the difference between the market and contract prices, its loss should be placed at $976,000. At the end of 1956, DMPA had purchased the full fifteen million pounds authorized by the directive, at the higher prices set forth therein. Defendant contends that it is highly probable that had plaintiff delivered the 2,400,000 pounds of ore specified in the EPS contract, the fifteen million pounds authorized by the DMPA directive would probably have been reduced by an identical quantity. Defendant does not, however, offer any concrete support for this assumption.

Although defendant informs us in its brief that the "weight of authority" has "well established" the proposition that a buyer aggrieved by a seller's breach of a sales contract need not repurchase the undelivered goods to recover damages measured by the difference between the market and contract prices, the sole supporting authority cited is United States v. U. S. Foreign Corporation, 151 F.Supp. 658 (S.D.N.Y.), wherein a moderated

statement of the proposition appears as the unsupported *obiter dictum* of the district judge.

In the classic case of a vendor's breach of a contract for the sale of goods, the vendee is often said to be entitled to damages equal to the difference between the contract price and the market price. In these cases, however, the proposition attains utility only because the aggrieved vendee has proven that it actually suffered losses in that amount as a natural and proximate result of the vendor's breach. Often this is established by proving that the vendee went out on the open market following the vendor's breach and replaced or sought to replace the undelivered goods. General propositions concerning the measure of damages are relevant to the particular controversy, however, only insofar as they reasonably represent the nature of the loss that the claimant can prove actually and proximately resulted from the vendor's nonperformance. Stated another way, the measure of damages to be applied in the particular case is irrelevant until the claimant has established the fact of losses that were the natural and proximate result of the breach of contract. Were this not true, the doctrine of mitigation of damages would lose much of its significance. The claimant bears the burden of proving the fact of loss with certainty, as well as the burden of proving the amount of loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation. Winn-Senter Construction Co. v. United States, 110 Ct.Cl. 34, 63.

In view of the circumstances attending this controversy, we do not believe that the Government has adequately discharged either of its burdens. Under the breached contract EPS was the signatory party. The Government has not attempted to show that EPS made efforts to replace the ore plaintiff failed to deliver, or even that it suffered loss in any way as a result of plaintiff's breach. As a matter of fact, the sole support of the claim of loss set forth in the Government's brief is the unsupported proposition that "it is reasonable to conclude that if delivery had been made under the EPS contract the requirements under the Defense Production Act of 1950 and Executive Order No. 10281 could have been reduced to the extent that plaintiff had performed under the EPS contract." No rationale is offered to provide any clue as to why this should be. In point of fact, EPS and DMPA undertook procurement pursuant to different delegations of statutory authority. The DMPA directive for the procurement of fifteen million pounds of columbite ore was issued in May 1952, at a time when EPS could reasonably have expected to receive delivery of the quantity under contract with plaintiff. Inasmuch as the DMPA directive, issued pursuant to the Defense Production Act of 1950, called for procurement of fifteen million pounds without reference to the quantity EPS had previously placed under contract pursuant to the Strategic and Critical Materials Stockpiling Act of 1946, it seems at least as reasonable to conclude that the DMPA purchases were to be in addition to those of EPS, and that had plaintiff delivered the ore under contract DMPA would have persisted in procuring the entire amount authorized, as it does to accept the Government's assumption. The order authorizing DMPA's procurement of the additional fifteen million pounds of columbite ore indicates on its face that it was designed to encourage expansion of production of the ore (finding 58) as distinguished from normal procurement on the open market, and bears the indisputable connotation that the higher prices specified therein were offered as an incentive to this end. In this context we find enlightening the testimony below to the effect that upon conclusion of the DMPA program the price of columbite ore fell drastically to levels below those specified in the EPS contract. The fact that DMPA did ultimately purchase the fifteen million pounds at the higher prices specified in the order has no proven relation to plaintiff's breach of contract. Consequently, in view of defendant's ut-

ter failure to establish any loss suffered by the Government as a result of plaintiff's breach, we conclude that defendant has failed to discharge its burden of proving the fact of loss thus precluding recovery on its counterclaim.

For the reasons stated we hold that neither party is entitled to any recovery as a result of this proceeding. Therefore plaintiff's petition and defendant's counterclaim will be dismissed.

It is so ordered.

JONES, Chief Judge, MADDEN, Judge (ret.), and LARAMORE and WHITAKER, Judges, concur.